Filed 9/29/21

CERTIFIED FOR PUBLICATION

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D078231 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. SCD145049) |
| THANDIEW SHARIF WILSON, | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of San Diego County, Melinda J. Lasater, Judge. Reversed and remanded with direction.

Susan S. Bauguess, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Steve Oetting and Anthony Da Silva, Deputy Attorneys General, for Plaintiff and Respondent.

Appellant Thandiew Sharif Wilson was convicted by a jury in July 2002 of, inter alia, murder with the special circumstance findings that it was committed during the commission or attempted commission of a robbery and a burglary. (Pen. Code,[1] §§ 187, subd. (a), 190.2, subd. (a)(17).) By finding the special circumstance allegations true, the jury necessarily found that Wilson either participated in the crimes with an intent to kill or was a major participant who acted with reckless indifference to human life. Wilson was sentenced to life without the possibility of parole, plus 25 years to life for a gun enhancement. We affirmed the judgment on appeal. (*People v. Wilson* (Dec. 23, 2003, D041120) [nonpub. opn.] (*Wilson*) (McConnell, P. J., McIntyre, J., Haller, J.).)[2]

Wilson appears before us now following the summary denial of his petition for resentencing pursuant to section 1170.95 (Petition). The trial court denied the Petition in light of the jury's special circumstance findings, which this court deemed a categorical bar to resentencing relief. (*People v. Gomez* (2020) 52 Cal.App.5th 1 (*Gomez*) (O'Rourke, J., Benke, A. P. J., Huffman, J.), review granted Oct. 14, 2020, S264033.)

Recently, however, another panel of this division held that a felony murder special circumstance finding does *not* bar resentencing relief under section 1170.95 as a matter of law, having been persuaded by the reasoning of those Courts of Appeal that have considered the issue post-*Gomez*. (*People v. Arias* (2021) 66 Cal.App.5th 987 (*Arias*) (McConnell, P. J., Guerrero, J.,

---

[1] All further unspecified statutory references are to the Penal Code.

[2] We previously granted Wilson's request for judicial notice of the record and nonpublished opinion in *Wilson*.

Dato, J.).)[3]  Our review of that caselaw and the evolving meaning of the terms "major participant" and "reckless indifference to human life" also persuades us that special circumstance findings cannot be a categorical bar to resentencing relief.  Therefore, we reverse the order summarily denying the Petition and remand to the trial court with direction for a determination on whether Wilson made a prima facie showing of entitlement to relief under section 1170.95.

BACKGROUND

I

*Factual Background*[4]

On the evening of July 6, 1999, Wilson, his brother Thabiti Wilson (Thabiti),[5] and Brian Mason went to a party held by Henry Mabry in a motel room.  Wilson, Thabiti, and Mason were members of a "Blood-set" gang, "Lincoln Park," while Mabry and the others at the party were members of a rival "Crip-set" gang.  During the party, Thabiti and Mason began rapping lyrics insulting to Crips gang members, including rapping about "crip killing" and using the derogatory term "crabs" to describe the Crips.  The Crips gang

---

[3]     The California Supreme Court has granted review on the issue of whether a felony-murder special-circumstance finding (§ 190.2, subd. (a)(17)) made before *People v. Banks* (2015) 61 Cal.4th 788 (*Banks*) and *People v. Clark* (2016) 63 Cal.4th 522 (*Clark*) precludes a defendant from making a prima facie showing of eligibility for relief under section 1170.95.  (See *People v. Strong* (Dec. 18, 2020, C091162) [nonpub. opn.], review granted March 10, 2021, S266606.)

[4]     The factual background is taken verbatim from *Wilson, supra*, D041120.

[5]     For the sake of convenience, we use Thabiti's first name.  We intend no disrespect.

members responded with their own derogatory rapping, including calling the Bloods "slobs." Eventually, Mabry became angry and wanted Wilson's group to leave. They left with a woman whom they drove to a trolley station.

Thabiti was angry because Mabry had insulted him. Wilson and Mason attempted to calm him. A short time later, after dropping off the woman at a trolley stop, Wilson, Thabiti, Mason, and a fourth man went to Mabry's motel room. Thabiti knocked on the door and claimed he had left his sunglasses or T-shirt in the room. Once the door was opened, all four men entered the motel room and locked the door. Initially, they pretended to look for the sunglasses or T-shirt.

Then, Thabiti pulled out a gun and said, "Everybody get on the floor" and "Give me all your jewelry or whatever you got." Wilson told one of Mabry's guests who was emerging from the bathroom, "Sit your ass down," and ordered him to "break his pockets," meaning the person should give Wilson his property. Wilson snatched a duffle bag from under two guests and looked through it. The bag belonged to Mabry and contained some property belonging to one of the guests. Another guest took off his chain and gave it to the fourth person who also pulled a necklace off Mabry's neck.

Mabry was asleep. One of Wilson's group said, "Wake his crab ass up," at which point, Wilson, Thabiti and Mason began beating Mabry and yelling out, "Lincoln Park." When Mabry attempted to fight back, Thabiti shot him in the head. Mabry died as a result of the gunshot wound.

A gang expert testified gang members commit crimes to gain respect among their own gang members and rival gangs. He also testified violence often results from making a derogatory remark to a rival gang member since the gang member who was insulted must retaliate or be viewed as a coward.

4

Wilson testified in his own defense, and admitted attending the party initially but denied returning to it later when Mabry was shot.

## II

### *Procedural Background*

A jury convicted Wilson in July 2002 of one count of first degree felony murder with the special circumstance findings that it was committed during the commission or attempted commission of a robbery and a burglary (§§ 187, subd. (a), 190.2, subd. (a)(17)), one count of burglary of an inhabited dwelling (§§ 459, 460), one count of robbery (§ 211), and six counts of attempted robbery (§§ 664, 211, 213, subd. (b)).  The jury also found true that the crimes were committed for the benefit of, at the direction of, or in association with, a criminal street gang, and that Wilson was a principal during the offense and that at least one principal fired a gun causing great bodily injury.  (§§ 186.22, subd. (b)(1), 12022.53, subds. (b), (e)(1).)  Wilson received a life sentence without the possibility of parole, plus 25 years to life for the gun enhancement.  We affirmed the judgment on appeal after ordering the abstract of judgment be amended to reflect that the sentence imposed on counts 3 to 9 was to be served concurrently.  (*Wilson*, *supra*, D041120.)

In January 2019, Wilson filed the Petition declaring he was entitled to resentencing relief under section 1170.95 on the ground that, pursuant to the changes to section 189, he could not now be convicted of first degree felony murder because he was not the actual killer, he did not act with the intent to kill, and he was not a major participant in the felony or act with reckless indifference to human life.

In its initial response to the Petition, the People argued that Wilson was ineligible for relief because he was convicted of first degree murder with

5

the special circumstances that it was committed during the commission of an attempted robbery and a burglary. Wilson, by then represented by appointed counsel, filed a reply arguing that an evidentiary hearing was required to determine whether he was a "major participant" and whether he acted with "reckless indifference to human life."

After briefing was completed, the People filed a supplemental initial response that relied on our opinion in *Gomez*, *supra*, 52 Cal.App.5th 1, review granted, and on *People v. Galvan* (2020) 52 Cal.App.5th 1134 (*Galvan*), review granted October 14, 2020, S264284. Although their analyses differed somewhat, both *Gomez* and *Galvan* held that a prior jury finding true special circumstances renders a petitioner ineligible for relief under section 1170.95 as a matter of law and that any challenge to the special circumstance findings must be brought in a petition for writ of habeas corpus. (*Gomez*, at pp. 16–17; *Galvan*, at pp. 1142–1143.)

In his second reply, Wilson countered with a line of cases holding that, contrary to *Gomez* and *Galvan*, a special circumstance finding does not categorically bar resentencing relief under section 1170.95. (*People v. York* (2020) 54 Cal.App.5th 250 (*York*), review granted Nov. 18, 2020, S264954; *People v. Torres* (2020) 46 Cal.App.5th 1168 (*Torres*), review granted June 24, 2020, S262011; *People v. Smith* (2020) 49 Cal.App.5th 85 (*Smith*), review granted July 22, 2020, S262835.)

The superior court denied the Petition on October 29, 2020, without issuing an OSC. The denial was premised on the court's review of the special circumstance instructions given to the jury. The court held that, "in order for the jury to have returned the special circumstance finding as it did, the jury found that the defendant acted with the intent to kill, aid, abet, counsel, command, induce, solicit, request, or assist the actual killer in the

6

commission of first degree murder and/or defendant was a major participant in the underlying felony and acted with reckless indifference to human life. This is consistent with the reasoning in [*Gomez*, *supra*, 52 Cal.App.5th 1, review granted]."

## DISCUSSION

On appeal, Wilson urges us to reconsider *Gomez*'s categorical bar to resentencing relief under section 1170.95. Relying on developments in the caselaw following *Gomez*, Wilson argues the jury's finding that he was a "major participant" who acted with "reckless indifference to human life" cannot stand because the meaning of those terms was significantly narrowed in *Banks, supra,* 61 Cal.4th 788 and *Clark, supra,* 63 Cal.4th 522.

We do not take lightly a party's request to reconsider a decision from this court, but we do recognize that there is now a split in this division as to the preclusive effect of special circumstance findings. (*Arias*, *supra*, 66 Cal.App.5th 987.) For reasons we will explain, we agree with *Arias* that "pre-*Banks* and *Clark* felony-murder special-circumstance findings do not categorically preclude defendants from obtaining resentencing relief under section 1170.95." (*Id.* at p. 1004.)

Although we respectfully depart from *Gomez*'s categorical bar to resentencing relief, we continue to share its concern about permitting the petitioner to relitigate settled factual issues. Therefore, our conclusion that Wilson's special circumstance findings do not categorically bar resentencing relief under section 1170.95 is counterbalanced—to a degree that is consistent with the statute's overall purpose—with Wilson's prima facie burden to show, on the record of conviction, that he is eligible for relief.

7

# I

## *Senate Bill No. 1437*

A.     *Statutory Changes*

Effective January 1, 2019, Senate Bill No. 1437 was enacted to "amend the felony murder rule and the natural and probable consequences doctrine, as it relates to murder, to ensure that murder liability is not imposed on a person who is not the actual killer, did not act with the intent to kill, or was not a major participant in the underlying felony who acted with reckless indifference to human life." (Stats. 2018, ch. 1015, § 1, subd. (f).)  In furtherance of this goal, it amended the definition of malice, as set forth in section 188, to add a requirement that all principals to a murder must act with express or implied malice to be convicted of that crime.  Senate Bill No. 1437 thus redefined "malice" in section 188 and narrowed the classes of persons liable for felony murder under section 189.  (Stats. 2018, ch. 1015, §§ 2–3.)

With these amendments in place, "A participant in the perpetration or attempted perpetration of a felony listed in subdivision (a) [including robbery and burglary] in which a death occurs is liable for murder only if one of the following is proven: (1) The person was the actual killer. [¶] (2) The person was not the actual killer, but, with the intent to kill, aided, abetted, counseled, commanded, induced, solicited, requested, or assisted the actual killer in the commission of murder in the first degree. [¶] (3) The person was a major participant in the underlying felony and acted with reckless indifference to human life, as described in subdivision (d) of Section 190.2." (§ 189, subd. (e).)

8

B.    *Procedure to Seek Resentencing*

Senate Bill No. 1437 also established a procedure for defendants previously convicted of murder to seek resentencing if they believe they could not currently be convicted of that crime under the amended provisions of sections 188 and 189.  (Sen. Bill No. 1437, § 4 [enacting newly codified section 1170.95].)  Thus, section 1170.95 allows those "convicted of felony murder or murder under a natural and probable consequences theory . . . [to] file a petition with the court that sentenced the petitioner to have the petitioner's murder conviction vacated and to be resentenced on any remaining counts . . . ."  (§ 1170.95, subd. (a).)

Section 1170.95 envisions three stages of review of a petition for resentencing.  (*People v. Lewis* (2021) 11 Cal.5th 952, 960–962 (*Lewis*).)  At the first stage, the court is tasked with determining the facial sufficiency of the petition—that is, whether it alleges that (1) an accusatory pleading was filed against the petitioner allowing prosecution under the felony-murder rule or the natural and probable consequences doctrine (§ 1170.95, subd. (a)(1)); (2) the petitioner was convicted of first or second degree murder following a trial, or pleaded guilty to first or second degree murder in lieu of a trial at which he or she could have been so convicted (*id.*, subd. (a)(2)); and (3) the petitioner could not today be convicted of first or second degree murder because of the 2019 amendments to sections 188 and 189 (*id.*, subd. (a)(3)).  (§ 1170.95, subd. (b)(1).)

If the petition is facially sufficient, the court proceeds to the second stage of review.  (§ 1170.95, subd. (c); *Lewis*, *supra*, 11 Cal.5th at p. 960.)  At this stage, the court must appoint counsel, if one has been requested, and

9

entertain briefing on the defendant's entitlement to relief under a prima facie standard. (*Lewis*, at p. 962.)[6]

If the defendant makes a prima facie showing, the court proceeds to the third stage of review by issuing an OSC and thereafter holding a full hearing to determine whether the defendant is entitled to relief. (§ 1170.95, subd. (d)(1); *Lewis*, *supra*, 11 Cal.5th at p. 960.) At this stage, "the burden of proof shall be on the prosecution to prove, beyond a reasonable doubt, that the petitioner is ineligible for resentencing." (§ 1170.95, subd. (d)(3).)

II

*Wilson's Felony-Murder Special-Circumstance Findings*

A defendant found guilty of first degree murder must be sentenced to death or imprisonment for life without the possibility of parole if the jury makes one or more special circumstance findings under section 190.2, subdivision (a). A defendant who is not the actual killer will be similarly sentenced if a jury finds him or her to have aided or abetted the murder with an intent to kill or was a major participant in the crime and acted with reckless indifference to human life. (*Id.*, subds. (c)–(d).)

Wilson, who was not the actual killer, was sentenced to life without the possibility of parole. The jury instructions confirm that the jury found Wilson either aided and abetted Mabry's murder with the intent to kill or was a major participant who acted with reckless indifference to human life. (§ 190.2, subds. (a)(17), (d).)

---

6    *Lewis* rejected the approach of some courts that interpreted subdivision (c) as requiring a two-step prima facie inquiry—first, " 'that petitioner "falls within the provisions" of the statute,' and . . . second ' "that he or she is entitled to relief." [Citation.]' " (*Lewis*, *supra*, 11 Cal.5th at pp. 961–962.)

10

On direct appeal in 2003, Wilson argued, among other things, that the evidence was insufficient to support the jury's special circumstance findings. (*Wilson*, *supra*, D041120.) We rejected this argument pursuant to *People v. Estrada* (1995) 11 Cal.4th 568 and *Tison v. Arizona* (1987) 481 U.S. 137 (*Tison*). We noted "the evidence indicated Mabry and Thabiti exchanged gang insults and argued. Wilson knew Thabiti was angry about being insulted. Despite having been asked to leave, Wilson and the others returned to Mabry's motel room armed with a gun and with an apparent intent to commit robbery, thus heightening the risk of death. The risk was enhanced because of the underlying gang tensions. According to the expert's testimony, violence often results when gang members are insulted to avoid being viewed as a coward. Further, Mabry was not alone in the room. There were several other people in the room including other gang members who might have resisted the armed invasion by Wilson's group. [¶] Under these hostile circumstances, a reasonable jury could conclude Wilson acted with full awareness and reckless indifference to human life when he participated in or aided and abetted the offenses." (*Wilson*, *supra*, D041120.)

## III

*Special Circumstance Findings as a Categorical Bar to Resentencing Relief*

### A

*The Judicial Split*

As discussed *ante*, Senate Bill No. 1437 amended section 189 to identify three classes of persons who can be liable for felony murder: those who kill (*id*., subd. (e)(1)), those who aid and abet with the intent to kill (*id*., subd. (e)(2)), and those who are a major participant and act with reckless indifference to human life (*id*., subd. (e)(3)).

On the face of it, both felony murder liability under section 189, subdivision (e)(3) and a special circumstance finding under section 190.2, subdivision (d) require that the defendant be deemed a "major participant" who acted with "reckless indifference to human life." Because of this parallel, *Gomez* would have us hold that the 2002 special circumstance findings in Wilson's case categorically bar resentencing relief on the Petition. Unwilling to require the People "to prove beyond a reasonable doubt, a second time, that [Wilson] satisfied those requirements for the special circumstance findings," *Gomez* directs Wilson to pursue his challenge to the special circumstance findings in a petition for writ of habeas corpus. (*Gomez, supra*, 52 Cal.App.5th at p. 17, review granted.) Only in that proceeding would Wilson bear both the burden to plead sufficient grounds for relief and then later to prove them. (*Ibid.*)

Wilson's request for reconsideration of *Gomez*'s categorical bar relies on *York, supra*, 54 Cal.App.5th 250, review granted. *York* held that, despite the semantic overlap between section 189, subdivision (e)(3) and section 190.2, subdivision (d), the California Supreme Court in *Banks* and *Clark* " 'construed the meanings of "major participant" and "reckless indifference to human life" "in a significantly different, and narrower manner than courts had previously." [Citation.]' " (*York*, at p. 258, citing *Smith, supra*, 49 Cal.App.5th at p. 93, review granted.) Accordingly, a special circumstance finding pre-*Banks* and *Clark* cannot bar resentencing "relief under the section 1170.95 *as a matter of law*, because the factual issues that the jury was asked to resolve in a trial that occurred before *Banks* and *Clark* were decided are not the same factual issues our Supreme Court has since identified as controlling." (*Ibid.*)

In *Arias*, our court found it unnecessary to add "further extensive argument or analysis" to the "vigorous debate" on the subject. (*Arias*, *supra*, 66 Cal.App.5th at p. 1004.) "It will suffice for us to state that we are persuaded by the logic of the courts that have concluded pre-*Banks* and *Clark* felony-murder special-circumstance findings do not categorically preclude defendants from obtaining resentencing relief under section 1170.95." (*Ibid.*)

*Arias* followed from *People v. Secrease* (2021) 63 Cal.App.5th 231, 247 (*Secrease*), review granted June 30, 2021, S268862. *Secrease* also disagreed with *Gomez*'s categorical bar to resentencing relief because *Banks* and *Clark* "placed new limits" on the meaning of "major participant" and "reckless indifference to human life." (*Id.* at p. 254.)

We agree with *Arias*.[7] Our examination, in Section III.B *post*, of the evolving meaning of the terms "major participant" and "reckless indifference to human life" convinces us that a special circumstance finding predating

---

[7] Since this case involves the application of law to undisputed facts, our review is de novo. (*People v. Blackburn* (2015) 61 Cal.4th 1113, 1123; *Martinez v. Brownco Construction Co.* (2013) 56 Cal.4th 1014, 1018.)

*Banks* and *Clark* cannot categorically bar resentencing relief under section 1170.95.[8]

B

*"Major Participant" and "Reckless Indifference to Human Life"*

1.      Enmund v. Florida

In *Enmund v. Florida* (1982) 458 U.S. 782, the United States Supreme Court considered the constitutionality of a death sentence imposed on the "getaway driver" in a robbery that resulted in two deaths.  The evidence adduced at trial revealed that Enmund did not rob or kill the victims, and there was no finding that he harbored any intent that a killing take place or that lethal force be used.  (*Id.* at pp. 784, 797.)  Instead, he was seen sitting in a car approximately 200 yards from the scene shortly before the robbery, and he was then seen driving the car with three passengers at a high rate of speed after the robbery.  (*Id.* at p. 784.)  On this evidence, he was found guilty of two counts of first degree murder and one count of robbery.  (*Id.* at p. 785.)  He was sentenced to death.  (*Ibid.*)

---

[8]      Although there is a split among the Courts of Appeal as to the process for challenging felony murder special circumstance findings, the courts are in consensus that some sort of judicial review post-*Banks* and *Clark* must occur either in the trial court or the appellate court.  This conclusion is mandated by *Fiore v. White* (2001) 531 U.S. 225, which held that it is a violation of an individual's due process right to remain incarcerated "for conduct that [a State's] criminal statute, as properly interpreted, does not prohibit."  (*Id.* at p. 228; see *In re Miller* (2017) 14 Cal.App.5th 960, 977–978 ["Like the Pennsylvania Supreme Court's opinion at issue in *Fiore,* our Supreme Court's opinions in *Banks* and *Clark* merely clarified the meaning of section 190.2— *Banks* and *Clark* merely clarified the 'major participant' and 'reckless indifference to human life' principles that existed when defendant's conviction became final."].)

14

The Florida Supreme Court affirmed the conviction and sentence. (*Enmund*, *supra*, 458 U.S. at p. 785.) According to that court, "the interaction of the ' "felony murder rule and the law of principals combine to make a felon generally responsible for the lethal acts of his co-felon." ' " (*Ibid*.) It held the evidence could have led the jury to " 'conclude[ ] that [Enmund] was there, a few hundred feet away, waiting to help the robbers escape with the [victims]' money. The evidence, therefore, was sufficient to find that the appellant was a principal of the second degree . . . support[ing] the verdicts of murder in the first degree on the basis of the felony murder portion of section 782.04(1)(a).' " (*Id.* at p. 786.)

The United States Supreme Court reversed. (*Enmund*, *supra*, 458 U.S. at p. 801.) The court's survey of state and federal jurisdictions that authorize the death penalty and a review of the sentencing decisions made by juries led it to observe that there was a societal rejection of the death penalty for accomplice liability in felony murders. (*Id.* at pp. 789–796.) The court then turned to the proportionality of the death sentence to the robbery offense. (*Id.* at p. 797.) It noted that, while "robbery is a serious crime deserving serious punishment," it is not one in which the risk of death or even serious injury is inherent in the crime, unlike murder. (*Ibid*.) Therefore, the death penalty "is an excessive penalty for the robber who, as such, does not take human life." (*Ibid*.) Instead, "[t]he focus must be on *his* culpability, not on that of those who committed the robbery and shot the victims." (*Id.* at p. 798.) "Enmund himself did not kill or attempt to kill; and, as construed by the Florida Supreme Court, the record before us does not warrant a finding that Enmund had any intention of participating in or facilitating a murder. . . . It is fundamental that 'causing harm intentionally must be punished more severely than causing the same harm unintentionally.' H.

15

Hart, Punishment and Responsibility 162 (1968).  Enmund did not kill or intend to kill and thus his culpability is plainly different from that of the robbers who killed; yet the State treated them alike and attributed to Enmund the culpability of those who killed the [victims].  This was impermissible under the Eighth Amendment." (*Id.* at p. 798.)

2.     Tison v. Arizona

A few years later, the United States Supreme Court again considered the constitutionality of a felony murder death sentence.  In *Tison, supra*, 481 U.S. 137, the defendants were two of three brothers who assembled a large arsenal of weapons to help their father and his cellmate, both convicted murderers, to escape prison.  (*Id.* at p. 139.)  The father was serving a life sentence for killing a guard during a previous prison escape.  (*Ibid.*)  When the brothers went into the prison, they brandished their weapons and armed their father and the cellmate.  (*Ibid.*)  They all then fled the prison grounds in a car.  (*Ibid.*)

The getaway car later broke down in the desert, and the group decided to flag down a passing motorist to steal another car.  (*Tison, supra*, 481 U.S. 137 at pp. 139–140.)  One brother stood in front of their disabled car, while the others armed themselves and hid.  (*Id.* at p. 140.)  After a family of four stopped to help, the group emerged and forced the family down a dirt road off the highway.  (*Ibid.*)  At this point, the father of the family begged for their lives; the defendants' father reportedly said he was "thinking about it." (*Ibid.*)  The defendants' father then told his sons to return to the car for some water for the family.  (*Ibid.*)  While the defendants went to the car, their father and his cellmate shot the family to death.  (*Id.* at p. 141.)  Neither defendant made an effort to help the victims.  (*Ibid.*)

16

Several days later, one of the three brothers was killed during a police shootout, and the father, who had escaped into the desert, died of exposure. (*Tison, supra*, 481 U.S. at p. 141.) The cellmate and the two remaining brothers were captured, and tried, convicted, and sentenced to death. (*Ibid.*) Though neither defendant had killed anyone, each was convicted of the four murders under Arizona's felony murder and accomplice liability statutes. (*Id.* at pp. 141–142.) Their convictions and sentences were upheld on appeal. (*Id.* at p. 143.) Defendants then collaterally attacked their death sentences. (*Ibid.*) A divided Arizona Supreme Court affirmed, interpreting " 'intent to kill' " under *Enmund* to include the foreseeability of lethal force. (*Id.* at pp. 143–145.) It held that, under the facts of the case, the brothers "played an active part" in the prison escape, they were aware that there was a possibility of killings during or after the escape, one of them flagged down the victims, one escorted the victims to where they would eventually be killed, neither interfered when the victims were killed, and neither disassociated himself from the actual killers afterwards. (*Ibid.*)

The United States Supreme Court reversed, holding that the Arizona Supreme Court's definition of intent was broader than that described in *Enmund*. (*Tison, supra*, 481 U.S. at p. 150.) The Supreme Court read the *Enmund* decision narrowly, noting that participation in a variety of violent felonies includes the possibility of lethal force. (*Id.* at p. 151.) But that, standing alone, cannot justify a death sentence. (*Ibid.*) Instead, the question was whether the record "would support a finding of the culpable mental state of reckless indifference to human life." (*Ibid.*) *Enmund* dealt with only "two distinct subsets of all felony murders . . . . At one pole was . . . the minor actor in an armed robbery, not on the scene, who neither intended to kill nor was found to have had any culpable mental state. . . . The Court held that

17

capital punishment was disproportional in these cases. *Enmund* also clearly dealt with the other polar case: the felony murderer who actually killed, attempted to kill, or intended to kill." (*Id.* at pp. 149–150.) *Enmund* left open "the intermediate case of the defendant whose participation is major and whose mental state is one of reckless indifference to the value of human life." (*Id.* at p. 152.)

Defendants argued the death sentence was not proportional to their role because, in *Enmund*'s terms, they did not kill, attempt to kill, or intend to kill. (*Tison, supra,* 481 U.S. at p. 151.) But "[a] narrow focus on the question of whether . . . a given defendant 'intended to kill,' . . . is a highly unsatisfactory means of definitively distinguishing the most culpable and dangerous of murderers. Many who intend to, and do, kill are not criminally liable at all—those who act in self-defense or with other justification or excuse. . . . On the other hand, some nonintentional murderers may be among the most dangerous and inhumane of all—the person who tortures another not caring whether the victim lives or dies, or the robber who shoots someone in the course of the robbery, utterly indifferent to the fact that the desire to rob may have the unintended consequence of killing the victim as well as taking the victim's property. This reckless indifference to the value of human life may be every bit as shocking to the moral sense as an 'intent to kill.' . . . [W]e hold that the reckless disregard for human life implicit in knowingly engaging in criminal activities known to carry a grave risk of death represents a highly culpable mental state, a mental state that may be taken into account in making a capital sentencing judgment when that conduct causes its natural, though also not inevitable, lethal result." (*Id.* at pp. 157–158.)

The court deemed the defendants' participation in the crime as "substantial," with each "actively involved in every element of the kidnapping-robbery and . . . physically present during the entire sequence of criminal activity culminating in the murder." (*Tison, supra,* 481 U.S. at p. 158.) In addition, actual armed escape and kidnapping involved a "reckless indifference to human life." (*Ibid.*) Accordingly, the court held that the defendants' conduct did not fall within the *Enmund* prohibition. (*Ibid.*)

3.    People v. Banks

Nearly two decades after *Tison* was decided and over a decade after Wilson was convicted, the California Supreme Court was asked to determine under what circumstances an accomplice who lacks an intent to kill may nonetheless qualify as a "major participant" so as to be eligible for the death penalty or life without the possibility of parole. (*Banks, supra,* 61 Cal.4th 788.) Recognizing that section 190.2, subdivision (d) was enacted to codify the holding of *Tison*, the Court noted that "*Tison* and [*Enmund*] collectively place conduct on a spectrum, with felony-murder participants eligible for death only when their involvement is substantial and they demonstrate a reckless indifference to the grave risk of death created by their actions. Section 190.2(d) must be accorded the same meaning." (*Id.* at p. 794.)[9]

The evidence in *Banks* showed that three men forced their way into a marijuana dispensary in a robbery and, in the process, one of them killed a security guard. (*Banks, supra,* 61 Cal.4th at p. 795.) The defendant was the getaway driver. (*Ibid.*) He was not present at the crime scene, and there was no evidence that he or the others had killed before or that he knew that any

_____

[9]    *Banks* held that "the standards we articulate, although developed in death penalty cases, apply equally to cases like this one involving statutory eligibility under section 190.2(d) for life imprisonment without parole." (*Banks, supra,* 61 Cal.4th at p. 804.)

19

of the three had killed before.  (*Id.* at p. 796.)  At most, cellphone records showed a handful of short calls between him and one of the three men around the time of the murder, and he was in the same criminal gang as two of the other men.  (*Ibid.*)  The jury relied on this evidence to convict the defendant of first degree murder and found true the special circumstance that the murder was committed during an attempted robbery or burglary.  (*Id.* at p. 797.)  He was sentenced to life without the possibility of parole.  (*Ibid.*)

On appeal, the Court of Appeal held that, as a getaway driver, the defendant had knowledge that death was always a possibility in an armed robbery, which was legally sufficient to support the jury's special circumstance finding under section 190.2, subdivision (d).  (*Banks*, *supra*, 61 Cal.4th at p. 797.)

Our high court disagreed.  *Banks* highlighted that, under *Enmund* and *Tison*, the focus is on "the defendant's *personal* role in the crimes leading to the victim's death."  (*Banks*, *supra*, 61 Cal.4th at p. 801.)  "*Tison* and *Enmund* establish that a defendant's personal involvement must be substantial, greater than the actions of an ordinary aider and abettor to an ordinary felony murder such as Earl Enmund."  (*Id.* at p. 802.)  As for the mental aspect of culpability, "[t]he defendant must be aware of and willingly involved in the violent manner in which the particular offense is committed, demonstrating reckless indifference to the significant risk of death his or her actions create."  (*Id.* at p. 801.)

*Banks* then listed several factors to determine whether a defendant is a "major participant" in a crime, though it held that none is "necessary" or "necessarily sufficient."  (*Banks*, *supra*, 61 Cal.4th at p. 803.)  "What role did the defendant have in planning the criminal enterprise that led to one or more deaths?  What role did the defendant have in supplying or using lethal

weapons?  What awareness did the defendant have of particular dangers posed by the nature of the crime, weapons used, or past experience or conduct of the other participants?  Was the defendant present at the scene of the killing, in a position to facilitate or prevent the actual murder, and did his or her own actions or inaction play a particular role in the death?  What did the defendant do after lethal force was used?  . . .  All may be weighed in determining the ultimate question, whether the defendant's participation 'in criminal activities known to carry a grave risk of death' (*Tison v. Arizona*, *supra*, 481 U.S. at p. 157) was sufficiently significant to be considered 'major' (*id.* at p. 152; see *Kennedy v. Louisiana* [(2008)] 554 U.S. [407,] . . . 421)." (*Ibid.*)

Applying the foregoing, the court held that the conduct of the defendant placed him "at the *Enmund* pole of the *Tison-Enmund* spectrum." (*Banks*, *supra*, 61 Cal.4th at p. 805.)  As in *Enmund*, the defendant's mere participation in an armed robbery was insufficient to conclude that there existed a grave risk of death.  (*Ibid.*)  The evidence revealed that the defendant "was absent from the scene, sitting in a car and waiting.  There was no evidence he saw or heard the shooting, that he could have seen or heard the shooting, or that he had any immediate role in instigating it or could have prevented it." (*Ibid.*)  On these facts, the defendant could not be deemed a "major participant" under section 190.2(d).  (*Id.* at p. 807.)

Nor did the evidence establish that the defendant acted with "reckless indifference to human life." (*Banks*, *supra*, 61 Cal.4th at p. 807.)  Noting once again that *Enmund* rejected the argument that mere participation in an armed robbery could warrant the death penalty, our high court highlighted the absence of any evidence that the defendant "intended to kill or, unlike the Tisons, knowingly conspired with accomplices known to have killed before.

21

Instead, as in *Enmund*, [the] killing of [the security guard] was apparently a spontaneous response to armed resistance from the victim." (*Id.* at pp. 807–808.)  Citing *Tison*, the court held that "[a]wareness of no more than the foreseeable risk of death inherent in any armed crime is insufficient; only knowingly creating a 'grave risk of death' satisfies the constitutional minimum." (*Id.* at p. 808.)

4.      People v. Clark

The California Supreme Court next addressed the culpability required for felony murder liability in *Clark*, *supra*, 63 Cal.4th 522.  There, the defendant was sentenced to death for two murders that he did not himself commit. (*Id.* at p. 535.)  The first occurred in 1991 during an attempted burglary of a CompUSA store. (*Ibid.*)  The victim was the mother of a store employee who had arrived to pick him up. (*Id.* at p. 537.)  Defendant's involvement in that crime was limited to the following:  he surveilled the store one month before the crime, intending to rob it after closing; he arranged for a fake ID for a friend who then rented a U-Haul truck to move stolen computers; he waited in the parking lot while his accomplice tied employees in the bathroom; and he drove to the back of the CompUSA store to move the stolen computers but then quickly drove away when his accomplice—the shooter—tried to enter the car. (*Id.* at pp. 536–539.)  The second murder, which occurred in 1994, was of a witness who was going to testify against the defendant in the CompUSA murder trial. (*Id.* at pp. 539–543.)  The evidence implicated the defendant's then-girlfriend. (*Ibid.*)

The defendant made several arguments on appeal. (*Clark*, *supra*, 63 Cal.4th 522.)  Relevant here, he argued there was insufficient evidence to support the jury's special circumstance findings that the CompUSA murder was committed while engaged in the commission of a burglary and the

attempted commission of a robbery. (*Id.* at p. 611; § 190.2, subd. (a)(17).) Our high court did not find it necessary to decide whether the defendant was a "major participant" in the crime since the evidence was insufficient to support the finding that he exhibited "reckless indifference to human life." (*Id.* at pp. 611–614.) Relying again on *Tison*, the court noted "that the necessary mens rea for death eligibility may be 'implicit in knowingly engaging in criminal activities known to carry a grave risk of death.' " (*Id.* at p. 616.) *Clark* determined that *Tison*'s examples of "reckless indifference" "provide some indication of the high court's view of [that phrase,] namely, that it encompasses a willingness to kill (or to assist another in killing) to achieve a distinct aim, even if the defendant does not specifically desire that death as the outcome of his actions." (*Id.* at pp. 616–617.)

Proceeding through the *Banks* factors discussed *ante,* the court held that it could "conclude that defendant had a prominent, if not the most prominent, role in planning the criminal enterprise that led to the death of [the victim]." (*Clark*, *supra*, 63 Cal.4th at pp. 613–614.) But the court did not find it necessary to decide the issue since the evidence was insufficient to support a finding that he exhibited "reckless indifference to human life." (*Id.* at pp. 614–615.) As in *Banks*, our Supreme Court identified a number of factors to determine whether a defendant had the requisite mens rea, again holding that none is "necessary" or "necessarily sufficient." (*Id.* at p. 618.) These factors include: (1) knowledge of weapons and use and number of weapons, (2) physical presence at the crime scene and opportunities to restrain the crime and/or aid the victim, (3) duration of the felony, (4) defendant's knowledge of his or her cohort's likelihood of killing, and (5) defendant's efforts to minimize the risks of violence during the felony. (*Id.* at pp. 618–623.)

23

Applying these factors, *Clark* determined that the evidence was insufficient to support a "reckless indifference to human life" finding. It noted first that the evidence revealed there was only one gun on the scene, which belonged to the shooter and had only one bullet in it. (*Clark*, *supra*, 63 Cal.4th at pp. 618–619.) The defendant himself was not at the scene when the murder occurred, and there was no evidence that he instructed the shooter to shoot any resisting victims. (*Id.* at pp. 619–620.) The evidence was also ambiguous as to why he fled the scene; it could have been because he wanted to avoid an approaching police car or because he saw the body of the victim. (*Id.* at p. 620.) These factors made it "difficult to infer his frame of mind." (*Ibid.*) Moreover, the evidence showed that the defendant planned the robbery to occur after closing when most of the employees would be gone. (*Ibid.*) To handle the few employees that remained, the plan was to handcuff them in the bathroom and conduct the robbery outside of their presence. (*Ibid.*) There was also no evidence that the defendant was aware that the shooter had a propensity for violence. (*Id.* at p. 621.) Lastly, as an issue of first impression, the court held that a defendant's efforts to minimize the risks of violence in the commission of a felony is relevant to an analysis of reckless indifference, though the ultimate objective determination is made by the jury. (*Id.* at pp. 621–623.)

## C

### *Wilson Not Categorically Barred From Resentencing Relief*

At the time Wilson was convicted, and as the foregoing demonstrates, felony murder liability could not be imposed on one who merely participated in the underlying felony. (*Enmund*, *supra*, 458 U.S. 782.) Where a defendant was not the actual killer and did not have an intent to kill, liability may be imposed only if his or her participation was "substantial" and he or she

"knowingly engag[ed] in criminal activities known to carry a grave risk of death." (*Tison, supra,* 481 U.S. at p. 157.) But these terms were nebulous. What type of conduct amounts to "substantial" participation? How would a jury determine if a defendant knew that he or she was engaging in a felony that carried a grave risk of death?

Years after Wilson's conviction, the California Supreme Court provided guidance in *Banks* and *Clark,* laying out several factors to help determine a defendant's actus reus and mens rea. In Wilson's case, a post-*Banks* and *Clark* jury would consider whether Wilson supplied or used a gun himself. They would ask, was there any evidence that Wilson knew his brother or any of his cohorts was carrying a gun? Was there evidence that Wilson's brother had a propensity for violence and, if so, did Wilson know about it? Did Wilson have any opportunities to restrain his brother before they returned to the motel room? Did he have any opportunities to do so once in the motel room? Did Wilson attempt to minimize the risk of violence in any way? Did he try to help Mabry after the shooting?

An analysis of these factual issues would sharpen the focus on Wilson's personal involvement in the underlying felonies and on his knowledge of the risk of death in participating in them. It is possible that a jury considering Wilson's conduct under the gloss of *Banks* and *Clark* could find that the People did not meet their burden in proving the special circumstances true. Because of this possibility, we respectfully depart from *Gomez*'s categorical bar.

# V

## *Remand is Appropriate*

The superior court denied Wilson's Petition pursuant to *Gomez* and did not separately determine if Wilson met his prima facie burden of showing entitlement to relief. A remand is therefore appropriate. On remand, "the court's task will be narrowly focused on whether, without resolving conflicts in the evidence and making findings, the evidence presented at trial was sufficient to support the felony-murder special-circumstance finding under *Banks* and *Clark*." (*Secrease, supra*, 63 Cal.App.5th at p. 264, review granted; *People v. Drayton* (2020) 47 Cal.App.5th 965, 980, abrogated on other grounds by *Lewis, supra*, 11 Cal.5th 952.) If the trial court determines that Wilson has made a prima facie showing, then "an order to show cause must issue and an evidentiary hearing must be held under section 1170.95, subdivision (d)(3)." (*Secrease*, at p. 264.) If Wilson fails to make that showing, then he would be ineligible for resentencing relief as a matter of law.

We recognize that we may conduct this review on appeal, having taken judicial notice of the record of conviction. (See *Secrease, supra*, 63 Cal.App.5th at pp. 255, 260–261, review granted.) However, we decline to do so because the parties have not briefed whether the record supports a special circumstance finding post-*Banks* and *Clark*. Remand will give the parties that opportunity.[10]

---

[10] In assessing whether Wilson met his prima facie burden, the trial court need not feel constrained by our analysis in *Wilson*. Since no court has yet conducted a post-*Banks* and *Clark* review, the law of the case doctrine does not apply. (*Gonzalez, supra*, 65 Cal.App.5th 420, review granted.)

Nonetheless, we observe several settled facts in our appellate opinion in *Wilson* that the trial court may consider.[11] (*Wilson*, *supra*, D041120.) For example, Wilson's defense during the trial was that he did not return to the motel room when Mabry was shot. But by convicting Wilson of the underlying crimes, the jury necessarily rejected this defense. Similarly, the jury found that Wilson was a principal during the offenses and that the crimes were gang-related. Thus, the trial court may rely on the following facts: Wilson returned to the motel room, he participated in the crimes, he was present when his brother shot Mabry, and the crimes were committed in connection with a criminal street gang. Any contention in the Petition that is inconsistent with these facts could and should be rejected. (*Lewis*, *supra*, 11 Cal.5th at p. 971 (" '[I]f the record, including the court's own documents, "contain[s] facts refuting the allegations made in the petition," then "the court is justified in making a credibility determination adverse to the petitioner." ' "].)

In this regard, we continue to share *Gomez*'s concern that a petitioner would feel entitled to relitigate settled factual issues. (*Gomez*, *supra*, 52 Cal.App.5th at p. 16, review granted.) On the other hand, our high court has emphasized that "[t]he 'prima facie bar was intentionally and correctly set very low.' " (*Lewis*, *supra*, 11 Cal.5th at p. 972.) Thus, the trial court should issue an OSC unless the record of conviction unequivocally negates Wilson's contentions, rendering him unable to meet his burden. *Gomez*'s resistance to shifting the burden to the People "a second time" must yield to section 1170.95's plain language and its "overall purpose," which is "to ensure that

---

11 Of course, the trial court should not rely solely on our appellate opinion. As *Lewis* cautioned, "the probative value of an appellate opinion is case specific, and 'it is certainly correct that an appellate opinion might not supply all answers.' " (*Lewis*, *supra*, 11 Cal.5th at p. 972.)

murder culpability is commensurate with a person's actions, while also ensuring that clearly meritless petitions can be efficiently addressed as part of a single-step prima facie review process." (*Lewis*, at p. 971.)

## DISPOSITION

The order denying the Petition is reversed and the matter is remanded for resumption of proceedings at the subdivision (c) stage to determine whether Wilson has made a prima facie showing that he is entitled to relief.


IRION, J.

WE CONCUR:


O'ROURKE, Acting P. J.


GUERRERO, J.